UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JULIO MATTA,

     Plaintiff,

     v.

JOHN W. SNOW,
Secretary of the Treasury,

     Defendant.

Civil Action No. 02-862 (CKK)

**MEMORANDUM OPINION**
(December 16, 2005)

Plaintiff, a former employee of the United States Treasury Department Bureau of Engraving and Printing ("BEP"), brings the above-captioned action against Defendant John W. Snow in his official capacity as Secretary of the Treasury pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"), alleging, *inter alia*, that he was subjected to a hostile work environment based on his national origin – Hispanic – and in retaliation for his activities as a Senior Equal Employment Opportunity ("EEO") Specialist in the BEP's EEO office. *See* Compl. at 13-15 (Count I). Currently before the Court is Defendant's Motion for Summary Judgment, which contends that (1) Plaintiff has failed to establish that any of the actions about which he complains occurred "because of" his national origin or his opposition to discriminatory practices; (2) the negative interactions identified by Plaintiff are insufficient as a matter of law to constitute a severely abusive or hostile work environment; and (3) the BEP acted promptly and appropriately in addressing Plaintiff's concerns and "preventing" any future problems, thereby negating any potential liability.

Upon a searching examination of Defendant's Motion for Summary Judgment, Plaintiff's

Opposition, Defendant's Reply, the relevant case law, the attached exhibits, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment.

## I: BACKGROUND

*A.    Procedural Background*

On May 3, 2002, Plaintiff, who identifies himself as "an African-Hispanic American," Pl.'s Disputed Mat. Facts ¶ 1, filed the above-captioned action.  Named as Defendants were Paul O'Neill, then-Secretary of the Treasury,[1] and the following who are sued individually and in their capacities as employees of the Department of the Treasury:  Brian Saxe, Robert Erbe, Russell U. Carpenter, and George B. Boyer (collectively "Individual Defendants").[2]  Compl. at 1.  Defendants Saxe, Boyer and Carpenter were at the time of the alleged incidents BEP Labor Management Relations ("LMR") managers, and Defendant Erbe was a BEP attorney.  *Id.* ¶¶ 10-13; Def.'s Stmt. of Mat. Facts Not in Dispute ("Def.'s Stmt. of Mat. Facts") ¶¶ 11-13.  Defendants Erbe, Boyer and Saxe are white males, and Defendant Carpenter is a Black, non-Hispanic male.  *Id.*

Plaintiff's Complaint contains seven counts.  Count I alleges unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964.  *Id.* at 13.  Count II alleges unlawful discrimination in violation of 29 C.F.R. §§ 1614.101(b), 1614.102(a)(3), (5), (6), and (13), and 1614.102(b)(4).  *Id.* at 15.  Count III alleges defamation of character.  *Id.* at 16.  Count IV alleges misrepresentation and fraud.  *Id.* at 19.  Count V alleges intentional infliction of emotional distress.  *Id.* at 21.  Count VI alleges conspiracy in violation of 42 U.S.C. § 1985(3).  Finally, Count VII

---

[1] During the course of this litigation, the Court substituted current Secretary of the Treasury, John Snow, as lead Defendant.

[2] On July 19, 2002, the United States filed a notice, substituting itself as Defendant for the Individual Defendants.

alleges that Plaintiff is entitled to attorney's fees and costs under the Equal Access to Justice Act. *Id.*

In a Memorandum Opinion dated September 29, 2003, this Court granted-in-part and denied-in-part Defendants' Motion to Dismiss and for Summary Judgment. *See Matta v. O'Neill*, Civ. No. 02-862 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and denying-in-part Defendants' Motion to Dismiss and for Summary Judgment). Specifically, the Court (1) accepted the certification of the Assistant United States Attorney and substituted the United States for the Individual Defendants pursuant to Title 28 U.S.C. § 2679, *id.* at 23, and (2) dismissed for lack of jurisdiction and/or failure to state a claim Counts II, III, IV, V, VI, and VII of Plaintiff's Complaint, *id.* at 23-25,31-32. Moreover, given the fact that "[t]he only proper defendant in a Title VII suit . . . is the 'head of the department, agency, or unit' in which the allegedly discriminatory acts transpired," *Hackley v. Roudebush*, 520 F.2d 108, 115 n.17 (D.C. Cir. 1975), the Court dismissed Plaintiff's Title VII claims as they related to the Individual Defendants. *Id.* at 26. However, the Court denied Defendants' motion as it related to Plaintiff's hostile work environment claim (Count I) against the agency, finding that "[t]he factual record at this time is not developed fully enough for this court to determine whether or not Plaintiff is able to make out a hostile work environment claim." *Id.* at 30. The Court did limit this claim somewhat, as it concluded that Plaintiff had failed to provide a sufficient evidentiary basis upon which a reasonable jury could conclude that he was constructively discharged from the BEP, *id.* at 30-31, and pointed out that Plaintiff "has not alleged or even alluded to a claim for failure to promote," *id.* at 30.

B.     *Relevant Factual History*

Upon the completion of discovery, the following material facts are undisputed.[3]

---

[3] The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)). As such, in resolving the

1.    <u>Plaintiff's Duties and Responsibilities at the BEP's EEO Office</u>

Plaintiff, Julio Matta ("Plaintiff" or "Matta"), worked as a Senior EEO Specialist, GS-13, for the BEP's EEO office from September 25, 2000, until on or about October 20, 2001.  Def.'s Stmt. of Mat. Facts ¶ 2.[4]  As a Senior EEO Specialist, Plaintiff was required to "[c]ounsel employees and applicants who feel they have been discriminated against in the more complex and difficult cases."  *Id.* ¶ 3 (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 1; *id.*, Ex. D (Pl.'s Third Dep. Vol.) at 5:1-9).  Plaintiff's official contacts were with "supervisors and managers from first-line supervisors to Office Chiefs with representations from the Bureau, unions, EEO Specialists, personnel management specialists, etc."  *Id.* (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3).  The purpose of these contacts was to "resolve difficult and emotionally charged employment problems [, and] to obtain agreement and/or necessary action on the part of Bureau managers concerning employment policies and practices affecting Equal Employment Opportunity."  *Id.* (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3-4; Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 5:13-6:8).

---

present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.  The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

[4] Plaintiff's Statement of Disputed Material Facts fails to address the following of Defendant's factual statements:  ¶¶ 2-13, 19-21, 26-31, 33-34, 37-38, 40, and 47.  *See generally* Pl.'s Disputed Mat. Facts.  Having failed to contest these facts, Plaintiff is deemed to have conceded them.  *See* LCvR 7(h); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996); *Twist v. Meese*, 854 F.2d 1421, 1423-24 (D.C. Cir. 1988); *Heasley v. Dist. of Columbia Gen. Hosp.*, 180 F. Supp. 2d 158, 163 (D.D.C. 2002); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 58-59 (D.D.C. 2001).

Throughout Plaintiff's thirteen-month tenure at the BEP, Jean Pitts, an African-American female, was Chief of the BEP's EEO office. *Id*. ¶ 4.  Ms. Pitts reported directly to Tom Ferguson, a white male, who was the Director of the BEP. *Id*.  Plaintiff was initially hired as a Senior EEO Specialist; as such, his first-line supervisor was Sandra Mathews, an African-American female, who was the Supervisory EEO Specialist, while his second-line supervisor was Ms. Pitts. *Id*. ¶ 5.  In early November 2000, less than two months after his hiring, Ms. Pitts reassigned Plaintiff to the position of Technical Adviser to the Chief ("Technical Adviser"), another GS-13 position within the EEO office. *Id*. ¶ 6.  Plaintiff served as a Technical Advisr until he left the agency in October 2001, with Ms. Pitts serving as his first-line supervisor. *Id*.

As a Technical Adviser, Plaintiff continued to work as a full-time informal counselor, but also served as an "in house expert . . . on EEO matters." *Id*. ¶ 7 (citing Def.'s Mot. for Summ. J., Ex. E (Decl. of Jean Pitts (hereinafter, "Pitts Decl.")) ¶ 4; *id*., Ex. B (Pl.'s First Dep. Vol.) at 39:22-40:21).  In addition, Plaintiff's position as a Technical Adviser required the creation of orientation and training materials concerning EEO rights and responsibilities, and the provision of regular training to both the workforce and management on EEO rights and responsibilities. *Id*.  Given these wide-ranging duties, Plaintiff was required to maintain "positive" work relationships with both "staff members" – including managers – and "customers" – i.e., those who sought EEO counseling. *Id*. ¶ 8 (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 6:9-9:19; *id*., Ex. F (Performance Standards and Elements for EEO Specialist/Technical Adviser) at 3).  Moreover, Plaintiff, in his position as Technical Adviser, was required to display sensitivity to managers and customers, and maintain neutrality both in investigating informal complaints and in advising managers on EEO questions. *Id*.

Adherence to these carefully-outlined duties and responsibilities was crucial, because the EEO office was responsible for the informal counseling stage of the discrimination complaint process, which included processing informal complaints, while formal complaints were to be investigated by the Regional Complaint Center. *Id.* ¶ 9. Importantly, the EEO office did not have the authority to file a complaint on behalf of an employee with the Regional Complaint Center. *Id.* As such, Plaintiff's role in processing an informal complaint was to impartially "find the facts" and then recommend appropriate action to the EEO Chief. *Id.* ¶ 10. Plaintiff's role as the Technical Adviser was not to make final determinations as to whether discrimination had or had not occurred. *Id.*

2.      Relevant Communications Between Plaintiff and His Colleagues

During his thirteen-month tenure at the BEP, Plaintiff's correspondence with his colleagues indicates that a certain level of tension and contentiousness existed between Plaintiff and his cohorts. Discovery in this case focused on eight separate written exchanges between Plaintiff and his colleagues. According to Defendant, these eight communications highlight certain inappropriate behavior by Plaintiff, and provide the foundation for later concerns about Plaintiff by some of his colleagues.

First, on November 14, 2000, Plaintiff wrote an email to his first-line supervisor at the time, Sandra Mathews, on which he cc'd Ms. Pitts, stating:

> I notice that you have assigned Mr. Crawford James Case to me in the EEO Log. I am requesting that you log this entry correctly and assign that EEO Counseling to Mr. James Malloy . . . . *I am not responsible for the case nor am I going to be monitoring such case. [T]his is the supervisor['s] job . . . . you need to keep abreast of the case . . . .* to insure timeliness by our office. So, in the spirit of correctness, please reassign this case to the proper individual to wit: Mr. James Malloy.

Def.'s Stmt. of Mat. Facts ¶ 15 (emphasis added); Pl.'s Disputed Mat. Facts ¶ 15 (explaining that he

was not supervised by Ms. Mathews after November 29, 2000, and he was concerned that Mr.

Malloy was not being assigned sufficient cases); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 15 (Ms.

Mathews was Plaintiff's supervisor at the time of this email).

Second, on November 29, 2000, Don Jamerson, a BEP manager, sent an email to Ms. Pitts

expressing his concern that Plaintiff had "quizzed" two of his employees about alleged racial

harassment before even giving Mr. Jamerson notice that an EEO complaint had been filed.  Def.'s

Stmt. of Mat. Facts ¶ 16; Pl.'s Disputed Mat. Facts ¶ 16 (attempting to explain his conduct); Def.'s

Reply to Pl.'s Disputed Mat. Facts ¶ 16 (noting that Plaintiff's explanation did not dispute that he

followed this course of conduct, and pointing out that Plaintiff's explanation is based upon

incompetent evidence).  Ms. Pitts then forwarded this email to Plaintiff, who responded via an email

in which he attempted to explain his actions.  *Id*.  Plaintiff cc'd Mr. Jamerson on his email to Ms.

Pitts.  *Id*.  Plaintiff, in the email, described Mr. Jamerson's employees as "twist[ing] issues

somewhat."  *Id*. (quoting Def.'s Mot. for Summ. J., Ex. I (Pl.'s Nov. 20, 2000 email) at 1).  Plaintiff

also said that it would be a "direct violation of [29 C.F.R.] 1614" for Mr. Jamerson to have Mr.

Boyer investigate the alleged racial incident to determine whether disciplinary action was warranted.

*Id*.  In response, Ms. Pitts cautioned Plaintiff about cc'ing someone outside the EEO office (Mr.

Jamerson) on what should have been an internal communication.  *Id*.  Upon receipt of Ms. Pitts'

response, Plaintiff pledged that he would "use more care in judgment before using cc next time."  *Id*.

(quoting Def.'s Mot. for Summ. J., Ex. J (Pl.'s Nov. 30, 2000 email) at 1).

Third, on February 10, 2001, Plaintiff distributed a memorandum to the Joint

Apprenticeship Advisory Committee ("JAAC") concerning the possible removal of an African-

American employee from the apprenticeship program who failed two program-related courses.

Def.'s Stmt. of Mat. Facts ¶ 17; Pl.'s Disputed Mat. Facts ¶ 17 (explaining his conduct); Def.'s

7

Reply to Pl.'s Disputed Mat. Facts ¶ 17 (noting that Plaintiff's explanation is without citation to the record, and Plaintiff concedes the underlying facts).  In his memorandum, Plaintiff argued for the employee's placement on "academic probation," and concluded:

> If Mr. _____ [redacted] is terminated from the program and in the future, [and] other apprentices are provided with the opportunity for remedial training or retraining, Mr. _____ [redacted] will have sufficient evidence to raise the inference of Discrimination.  Also, if his participation came as the result of an EEO decision, his dismissal without the stipulated benefit of remedial training or retraining set forth by this policy can and will be seen as Retaliation by the U.S. Equal Employment Opportunity Commission.

*Id*.  This memorandum caused significant consternation among Plaintiff's colleagues, as he was not authorized to speak for the EEOC in making this representation, nor had he performed an investigation into whether there were any similarly-situated white employees.  *Id*.

Fourth, on March 14, 2001, Plaintiff distributed another memorandum to the JAAC.  This memorandum asserted that the JAAC earlier had made a "binding agreement" to retain the employee who had failed two courses.  Def.'s Stmt. of Mat. Facts ¶ 18; Pl.'s Disputed Mat. Facts ¶ 18 (offering explanation for his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 18 (noting that Plaintiff's explanation lacks any citations to the record, and arguing that it provides further evidence of Plaintiff's lack of neutrality, in that he argues that "[t]here was no need" to investigate whether there were similarly-situated white employees before making the pronouncement that his office would consider the removal of the employee from the program "as a discriminatory act of Pretext").  Plaintiff concluded that terminating the employee from the apprenticeship program would be a breach of the purported agreement, and further stated that:  "As the representative of the Equal Employment Opportunity Office, any such breech [sic] would be interpreted as a discriminatory act of Pretext to eliminate this individual from the program."  *Id*. (quoting Def.'s Mot. for Summ. J., Ex. L (Pl.'s Mar. 14, 2001 JAAC Mem.) at 1-3).  At the time Plaintiff wrote the memorandum making

these assertions, Plaintiff had not done an investigation into whether there were similarly-situated

white employees. *Id*. Moreover, Plaintiff took the extraordinary step of providing the employee in

question a blind copy of this memorandum. *Id*.

Fifth, on April 9, 2001, Plaintiff wrote an email to Shawn Thompson, a member of the

Electrical Appliance Committee, on which he cc'd Ms. Pitts and Sondra Hutchinson, an African-

American female who served as the agency's HR Director. Def.'s Stmt. of Mat. Facts ¶¶ 12, 19.

Plaintiff's email expressed his "concern and disapproval" that a meeting of the committee had taken

place in his absence, emphasizing:

> As with many other committee meetings . . . (four to be exact) . . . . when Mr. Phil
> Boyer has not been able to attend at the last minute, all meetings have been
> rescheduled. If I was unable to attend, or in the future when I am unable to attend, I
> expect no less Professional Courtesy or Respect than any of the Committee Members
> and the meeting should be reschedule [sic] . . . . No other committee member should
> have a privilege of rescheduling [a] Committee meeting because they can't attend,
> and others are just overlooked. I resent such professional disrespect . . . .

*Id*. (quoting Def.'s Mot. for Summ. J., Ex. M (Pl.'s First Apr. 2, 2001 Email) at 1). Ms. Pitts wrote

back to Plaintiff, reminding him: "Julio, you're getting emotional on the email again with ccs to

myself and Hutchinson. I thought we agreed we would talk before you sent another one of these

without my knowledge." *Id*. (quoting Def.'s Mot. for Summ. J., Ex. M (Pitts' First Apr. 2, 2001

Email)); *see also* Def.'s Stmt. of Mat. Facts ¶ 21 (Plaintiff acknowledged in his deposition that Ms.

Pitts cautioned him "once or twice, maybe three times" about his being too emotional in his

communications with other BEP offices). Ms. Pitts then wrote to Shawn Thompson, explaining that

she had "just spoke with Julio and explained that I'm sure you did not mean any disrespect by

continuing on with the meeting that he was unable to attend . . . . I trust that the email message . . .

will not change the excellent long-standing relationship our offices have established over the years."

*Id*. (quoting Def.'s Mot. for Summ. J., Ex. N (Pitts' Second Apr. 2, 2001 Email)). Ms. Pitts then

instructed Plaintiff to apologize to Mr. Thompson; Plaintiff did so, admitting that "the issues and situations which lead [sic] me to acknowledge my disappointment were with another committee and not this one, and I lost sight of that." *Id.* (quoting Def.'s Mot. for Summ. J., Ex. O (Pl.'s Second Apr. 2, 2001 Email)).

Sixth, on May 3, 2001, Officer Susan Vandergriff approached Plaintiff about a reasonable accommodation issue, informing Plaintiff that Commander Ashton had requested additional medical information in connection with her request for a reasonable accommodation "because she [Commander Ashton] was not satisfied with" the documentation that Officer Vandergriff already had submitted.  Def.'s Stmt. of Mat. Facts ¶¶ 22-24; Pl.'s Disputed Mat. Facts ¶¶ 22-24 (attempting to explain his conduct); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶¶ 22-24 (noting that Plaintiff does not dispute the facts asserted, and instead purports to offer explanations for his conduct – as well as other non-responsive allegations – without citing to any relevant record evidence).  Ms. Vandergriff was also upset that Commander Ashton was apparently keeping "a file on all her medical documentation in the privacy of her [Commander Ashton's] office."  *Id.*

While Office Vandergriff was still in Plaintiff's office, Plaintiff called Mr. Saxe and advised him – in Office Vandergriff's presence – that:  (1) "at least five Police Officers have alleged that Commander Ashton was requesting an enormous amount of medical documentation, and that she had informed these officers that she had the right[] to keep all medical documentation in a private file cabinet in her office"; (2) Commander Ashton was "in violation of the ADA and/or Section 501 of the Rehabilitation Act"; and (3) "the only other means to stop this discriminatory practice would be to file for assistance with the Office of Federal Operations, Equal Employment Opportunity Commission, because if any other these incidents would reach the floor of a federal court, it would be costly to BEP." *Id.* (citing Def.'s Mot. for Summ. J., Ex. P (Formal EEO Compl.) at Bates #

000013-14; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 82:18-83:2).  Indeed, before May 3, 2001,

Plaintiff had advised Commander Ashton "on several occasion[s]," of the "potential Per Se violation

of illegally withholding medical documentation outside of Human Resources or the Medical

department."  *Id.* ¶ 23 (citing Def.'s Mot. for Summ. J., Ex. P (Formal EEO Compl.) at Bates #

000014; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 61:15-63:21).  Plaintiff also called Mr. Saxe because

he was concerned about Commander Ashton deciding for herself whether medical documentation

was sufficient to support an accommodation request – an action that he opined is illegal for a

supervisor to take.  *Id.* ¶ 24 (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at

51:14-53:24).

Seventh, on May 8, 2001, Sandra Mathews – Plaintiff's former first-line supervisor and the

Supervisory EEO Specialist – left an assignment on Plaintiff's desk.  Def.'s Stmt. of Mat. Facts ¶

25; Pl.'s Disputed Mat. Facts ¶ 25 (attempting to explain his conduct); Def.'s Reply to Pl.'s

Disputed Mat. Facts ¶ 25 (noting, once again, the Plaintiff concedes the underlying facts, only

attempts to explain his conduct, and his explanation is devoid of any citation to record evidence).

Plaintiff responded with an email, which stated in relevant part:

> I received the . . . case, I will study the documents and call her in.  Also, I would
> greatly appreciate if next time you have something for me to please place it in my
> inbox.  I don't have any outstanding Counselors Reports due to you or the RCC, so I
> don't understand the need for you to go into my office unless it is an emergency.

*Id.* (citing Def.'s Mot. for Summ. J., Ex. Q (Pl.'s May 8, 2001 Email) at 1).

Eighth, and finally, on May 24, 2001, Ms. Pitts presented Plaintiff with his mid-year

progress review.  The review stated:

> I have reviewed your assignment and/or projects as they relate to your standards and
> elements during this half of the rating period.  At this time, there are no elements that
> fall below the achieved standards level.  Take this opportunity to review your
> standards and elements to assist you in achieving the best evaluation you can through

the goals you've set for yourself.  I look forward to working with you during the
second half of this assessment/evaluation period.

*Id*. ¶ 26 (quoting Def.'s Mot. for Summ. J., Ex R (Mid-Year Progress Review)).  Despite this

favorable review, Plaintiff wrote back to Ms. Pitts on May 29, 2001, to complain about his Mid-

Year Progress Review.  *Id*. ¶ 27.  Despite acknowledging that Ms. Pitts had informed him that

everyone in the EEO office received the same type of mid-year review, Plaintiff wrote:

> To indicate that my assignments and project[s] have only presented such marginal
> critic [sic] is an insult to me as a professional and discriminatory on your part . . . .
> To diminish my ability in this manner is to subject me to unequal terms, conditions
> and privileges of employment since I have been rated the same as individuals who
> work extremely less than me and are extremely less qualified than me . . . . I have
> been loyal, professional, efficient, trustworthy, and honorable since the first day I met
> you.  This misrepresentation of my first 8 months of work is truly unfair, unjust and
> discriminatory . . . . That no elements have fallen below achieve is the most
> egregious illustration of my abilities since there is a preponderance of evidence that
> will clearly show that all my elements (achievement) have surpass [sic] achieve and
> are clearly outstanding.  I am sincerely hurt and in shock that you, especially you
> who I have held in such [a] special place and pedestal, would disrespect me in such
> manner.

*Id.* (quoting Def.'s Mot. for Summ. J., Ex. S (Pl.'s May 29, 2001 Mem.) at 1-2); *see also* Def.'s

Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 47:11-52:5 (Plaintiff later testified that he used

the word "discriminatory" in this memorandum even though he did not believe that Ms. Pitts was

discriminating against him on the basis of any protected category, but merely because he believed

she was being unfair).

### 3.   Plaintiff's Interactions With Messrs. Saxe, Boyer, Carpenter, and Erbe

As noted previously, *see supra* Section I(A), Plaintiff has identified four specific BEP

employees that he claims harassed him:  Brian Saxe, Robert Erbe, Russell U. Carpenter, and George

B. Boyer.  *See* Def.'s Stmt. of Mat. Facts ¶ 11; *see also* Def.'s Mot. for Summ. J., Ex. B (Pl.'s First

Dep. Vol.) at 80:11-81:10 (these are the only BEP employees that Plaintiff claims harassed him).

12

None of these individuals was in Plaintiff's chain of command, and none had supervisory authority over him. Def.'s Stmt. of Mat. Facts ¶ 14; Pl.'s Disputed Mat. Facts ¶ 14 (disputing only whether these individuals had the power to take an adverse personnel action against him); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 14. As illuminated in the record by the discovery process in this case, Plaintiff had the following interactions with these individuals:

i.      *Mr. Saxe*

Plaintiff recalls having only one conversation with Brian Saxe during the entire time that he was employed at the BEP – the May 3, 2001 telephone conversation regarding Commander Ashton where Plaintiff had Officer Vandergriff in his office. Def.'s Stmt. of Mat. Facts ¶ 28. According to Plaintiff, that telephone conversation "was not confrontational," and Mr. Saxe did not use any type of derogatory terms with regard to Plaintiff. *Id.* (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 81:2-4, 81:13-24). Indeed, although Plaintiff saw Mr. Saxe around the office, he never personally met him. *Id.* ¶ 29. Mr. Saxe never physically attacked Plaintiff, and never physically or verbally threatened him in any way. *Id.* Moreover, Plaintiff never personally heard Mr. Saxe make a derogatory comment about him based on his national origin, nor did he ever hear from someone else that Mr. Saxe had made such a comment. *Id.* ¶ 30 (citing Def.'s Mot. for Summ. J., Ex. D (Pl.'s Third Dep. Vol.) at 33:10-18).

ii.     *Mr. Boyer*

 Plaintiff recalls interacting with George B. Boyer on only three occasions. *Id.* ¶ 31. The first two occasions were meetings of the JAAC on February 12, 2001, and March 13, 2001. *Id.* At these meetings, which included individuals other than Plaintiff and Mr. Boyer, no harsh words or rude statements were exchanged between Mr. Boyer and Plaintiff, and there was no overt hostility between the two individuals. *Id.* The third occasion was a one-on-one meeting sometime before

July 20, 2001, in which Mr. Boyer and Plaintiff met to discuss a joint effort by the EEO office and

LMR to draft a reasonable accommodation policy. *Id.* ¶ 32. Once again, there was nothing hostile

in the interaction between the two individuals at that meeting. *Id.* Indeed, whenever they saw each

other in the hallway, Plaintiff would say hello, and Mr. Boyer would nod. *Id.* ¶ 33. Plaintiff never

had any hostile face-to-face interactions with Mr. Boyer, and never personally heard Mr. Boyer

make a derogatory comment about him based on his national origin. *Id.* ¶¶ 34-35. Plaintiff also

never heard from anyone else that Mr. Boyer had made a derogatory comment about him based on

his national origin. Def.'s Stmt. of Mat. Facts ¶ 35; Pl.'s Disputed Mat. Facts ¶¶ 32, 35 (contending

that while "Mr. Boyer never subjected plaintiff to a discriminatory action in person" he "continued

to do so throughout the workforce" based upon Mr. Cole's belief that Mr. Boyer "was trying to

accuse plaintiff of initiating a dispute on pay and soliciting the approval of Mr. Cole" and that "said

incident . . . was race related"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶¶ 32, 35 (noting that

Plaintiff lacks competent evidence for his "conclusory allegation," as Mr. Cole's purported belief is

immaterial – given that Plaintiff complains of discrimination based on national origin, not race –

and based on worthless speculation).

### iii.    *Mr. Carpenter*

The only direct interactions that Plaintiff had with Russell U. Carpenter occurred in two

face-to-face meetings in February or March, 2001. Def.'s Stmt. of Mat. Facts ¶ 36. The purpose of

these meetings was to discuss reasonable accommodation for a police officer. *Id.* In one of the

meetings, there was no overt hostility between the two individuals. *Id.* ¶ 37. However, in the other

meeting, Plaintiff and Mr. Carpenter had a disagreement about the law, and Plaintiff left the meeting

feeling that Mr. Carpenter's tone got "a little aggressive." Def.'s Stmt. of Mat. Facts ¶ 36; Pl.'s

Disputed Mat. Facts ¶ 36 (asserting that Mr. Carpenter defamed him in two ways: (1) he advised

management officials that Plaintiff's interpretation of the law was in error, but actually Carpenter

was incorrect; (2) he once remarked to Brian Thompson that Plaintiff had no business participating

in collective bargaining negotiations); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 36 (noting that a

disagreement about the law does not constitute discrimination, and that Carpenter's purported

statement to Thompson does not constitute defamation).  It is undisputed that Mr. Carpenter did not

insult Plaintiff, accuse him of being incompetent, call him names, or make any national origin-based

derogatory comments to him at the meeting.  Def.'s Stmt. of Mat. Facts ¶ 36.  Moreover, Plaintiff

never personally heard Mr. Carpenter make a derogatory comment about him based on his national

origin, nor did he ever hear from someone else that Mr. Carpenter made a derogatory comment

about him based on his national origin.  *Id.* ¶¶ 36, 38.

iv.    *Mr. Erbe*

Plaintiff recalls having three face-to-face meetings with Robert Erbe, all of which occurred in

the context of the apprenticeship program.  *Id.* ¶ 39.  At two of those meetings, Plaintiff feels that

Mr. Erbe acted with hostility towards him.  *Id.*  The first of these incidents occurred at a meeting on

March 13, 2001, when Plaintiff felt that Mr. Erbe spoke to him in an angry tone of voice and was

dismissive of his input.  *Id.*  However, Mr. Erbe did not call Plaintiff any names, and backed off

from his comments when the apprenticeship chairman requested that he do so.  Def.'s Stmt. of Mat.

Facts ¶ 39; Pl.'s Disputed Mat. Facts ¶ 39 (admitting that "Mr. Erbe did in fact backed off [sic] after

showing his discriminatory behavior in front of witnesses based on plaintiff's input to the Committee

and their agreement to adhere by his recommendation in his capacity of Technical Adviser to the

Chief of EEO").  The only other meeting at which Plaintiff felt that Mr. Erbe acted with hostility

towards him occurred in May or June 2001.  Def.'s Stmt. of Mat. Facts ¶ 40.  According to Plaintiff,

when he entered the room, Mr. Erbe said – in a very negative voice – "What is he doing here?  We

don't need EEO here." *Id.* However, once the committee persuaded Mr. Erbe that Plaintiff was at the meeting properly, Mr. Erbe said nothing else that Plaintiff considered rude or dismissive. *Id.* Ultimately, Plaintiff never personally heard Mr. Erbe make a derogatory comment about him based on his national origin, and never heard from someone else that Mr. Erbe had made such a comment. Def.'s Stmt. of Mat. Facts ¶ 41; Pl.'s Disputed Mat. Facts ¶ 41 (citing to the testimony of Messrs. Thompson and Malloy, who believed that incidents that occurred outside of Plaintiff's presence were race-related); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 41 (noting that the testimony of Thompson and Malloy is both immaterial, as Plaintiff complains not of race-based discrimination but national origin-based discrimination, and inadmissible speculation that is incompetent to raise a genuine issue of material fact).

      4.   <u>Alleged Negative Oral Comments About Plaintiff Made Outside of His Presence</u>

In addition to alleged hostilities between Plaintiff and Messrs. Saxe, Boyer, Carpenter, and Erbe during various face-to-face meetings, Plaintiff cites to four incidents in which these individuals allegedly made unflattering comments about his work performance outside of his presence. Def.'s Stmt. of Mat. Facts ¶ 46.

First, within a week of the May 3, 2001 telephone conversation that Plaintiff had with Mr. Saxe about Officer Vandergriff's situation, the officer had a meeting with Mr. Saxe. *Id.* ¶ 42. At the meeting with Officer Vandergriff, Mr. Saxe stated that Plaintiff did not know what he was talking about with respect to what Commander Ashton could ask for in terms of medical documentation. *Id.*; *see also id.* (Mr. Saxe did not say that Plaintiff did not know what he was talking about in general) (citing Def.'s Mot. for Summ. J., Ex. T (Vandergriff Dep.) at 69:5-70:7). Mr. Saxe also told Officer Vandergriff that Plaintiff was "in trouble and a complaint had been filed,"

but did not specify the nature of the trouble.  *Id*.  At the end of the meeting, Mr. Saxe said, in a

whispering tone, something to the effect of, "I wouldn't go over there [to Plaintiff's office] for a

couple weeks until things have cooled down."  *Id*.  However, Mr. Saxe did not threaten Officer

Vandergriff with retaliation if she did go to see Plaintiff.  Def.'s Stmt. of Mat. Facts ¶ 42; Pl.'s

Disputed Mat. Facts ¶ 42 (contending that Officer Vandergriff was told that "she would suffer

consequences if she continued to seek [Plaintiff's] guidance as Technical Adviser in EEO Matters");

Def.'s Reply to Pl.'s Disputed Facts ¶ 42 (Officer Vandergriff specifically testified that Mr. Saxe did

not threaten her with retaliation if she went back to see Plaintiff) (citing Def.'s Mot. for Summ. J.,

Ex. T (Vandergriff Dep.) at 70:15-71:4).  Mr. Saxe did not use any other "unprofessional language"

when speaking about Plaintiff.  Def.'s Stmt. of Mat. Facts ¶ 42.  Ultimately, Officer Vandergriff was

granted the reasonable accommodation that she sought.  Def.'s Stmt. of Mat. Facts ¶ 42; Pl.'s

Disputed Mat. Facts ¶ 42 (arguing that Mr. Saxe's actions "had a chilling effect on [Officer

Vandergriff's] exercise [of] her rights to file a complaint or seek counseling"); Def.'s Mot. for

Summ. J., Ex. T (Vandergriff Dep.) at 73:7-74:2 (testifying that she received the sought-after

accommodation).

   Second, on May 10, 2001, at a collective bargaining negotiation attended by Local 32 union

representatives Brian Thompson and Chris Madden and LMR Managers Saxe and Carpenter, Mr.

Thompson presented a pamphlet that he had obtained from Plaintiff entitled "Collective Bargaining

and Equal Employment Opportunity Laws."  Def.'s Stmt. of Mat. Facts ¶ 43; Def.'s Mot. for

Summ. J., Ex. X (copy of the pamphlet presented).  When Saxe and Carpenter learned that Mr.

Thompson had obtained this information, they stopped contract talks for the day, although the talks

resumed roughly one week later.  *Id*.  At the May 10 meeting, Mr. Thompson also asked "for Mr.

Matta to come to the next meeting to oversee the two articles in our contract that deal directly with

EEO policy and laws." *Id.* However, while stating nothing degrading about Plaintiff, Messrs. Saxe and Carpenter responded that "Mr. Matta has no business in any contract talks and Mr. Matta is doing things outside of his jurisdiction." Def.'s Stmt. of Mat. Facts ¶ 43 (citing Def.'s Mot. for Summ. J., Ex. V (Thompson Aff.) at 2); Pl.'s Disputed Mat. Facts ¶ 43 (contending that the response of the LMR Managers violated 29 C.F.R. § 1614, as Plaintiff's position allowed him to participate when guidance was requested by union stewards); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 43 (pointing out that Plaintiff's argument that this incident "caused a chilling effect of union members to exercise their right to seek EEO guidance" is made without citation to any record evidence; and arguing that it would be inappropriate for Plaintiff – an ostensibly neutral counselor – to involve himself in contract negotiations on behalf of the union).

Third, on May 25, 2001, Officer Lawrence Smith and his union representative, Arthur Haynesworth, met with Mr. Erbe to discuss Officer Smith's reasonable accommodation request. Def.'s Stmt. of Mat. Facts ¶ 44. At this meeting, Mr. Erbe suggested that he and Officer Smith schedule a later meeting with management to clarify what medical documentation would be required to support Officer Smith's accommodation request. *Id.* Mr. Erbe then suggested that the meeting occur on June 5, 2001, and should include Commander Ashton (the commander of the shift to which Officer Smith was assigned), Mr. Saxe, and union officials. *Id.* Officer Smith responded that he would like to have Plaintiff present at the June 5, 2001 meeting. *Id.* Mr. Erbe then replied that having Plaintiff there "wouldn't be a good idea because Julio Matta and him have different views of the law." *Id.* (citing Def.'s Mot. for Summ. J., Ex. Z (Smith Aff.) at 2). Mr. Erbe further noted that "any question in reference to reasonable accommodation [sic] he can answer them at the meeting and that Julio Matta didn't have to be there." *Id.* (citing Def.'s Mot. for Summ. J., Ex. Z (Smith Aff.) at 2). However, Mr. Erbe did not say anything negative about Plaintiff's race or national

18

origin, did not call Plaintiff any names, and did not refuse to have the meeting if Plaintiff was

present.  Def.'s Stmt. of Mat. Facts ¶ 44 (citing Def.'s Mot. for Summ. J., Ex. Y (Smith Dep.) at

70:6-15, 70:21-71:11, 76:20-77:4); Pl.'s Disputed Mat. Facts ¶ 44 (contending that "Mr. Erbe was

defaming Plaintiff's ability to interpret the law as it pertained to Reasonable Accommodation").

Ultimately, Officer Smith was granted the reasonable accommodation that he sought.  Def.'s Stmt.

of Mat. Facts ¶ 44.

Fourth and finally, in August 2001, Eric Cole, a BEP technician, attended a meeting with

Messrs. Boyer, Carpenter, and Saxe to discuss pay issues.  *Id.* ¶ 45.  When the employees stated

their belief that their pay should have been increased in June, the LMR managers responded:

"Where did you [hear] that from[,] Julio Matta [?]" Def.'s Stmt. of Mat. Facts ¶ 45 (quoting Def.'s

Mot. for Summ. J., Ex. AA (Cole Aff.) at 1); Pl.'s Disputed Mat. Facts ¶ 45 (asserting that "Mr.

Cole was a witness to the continuous negative and hostile behavior plaintiff was being subjected to

by Mr. Saxs [sic], Carpenter, and Boyer").

5.    Alleged Negative Written Statements Concerning Plaintiff

In addition to the four negative oral comments made outside of his presence, Plaintiff has

also identified three documents that he claims defamed him regarding his professional abilities.

Def.'s Stmt. of Mat. Facts ¶ 47.  These documents were:  (1) Mr. Saxe's May 11, 2001

memorandum for the record regarding "Incidents Involving Mr. Motta [sic]"; (2) Mr. Boyer's draft

memorandum regarding "Response to Memorandum of Julio Matta"; and (3) Mr. Erbe's email of

June 19, 2001.  *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. BB (summaries from Boyer and Saxe);

Def.'s Mot. for Summ. J., Ex. DD (Erbe's June 19, 2001 Email).  Mr. Saxe's and Mr. Boyer's

memoranda were provided to Mr. Carpenter, who then forwarded them to Ms. Hutchinson – the HR

Director – under a cover memorandum stating:  "Per our conversation and for your review, attached

are the summaries from Phillip Boyer and Brian Saxe, of the incidents that occurred with Julio

Motta [sic]." Def.'s Stmt. of Mat. Facts ¶ 48.  Ms. Hutchinson then relayed the concerns raised in

these memoranda to Ms. Pitts, who shared copies with Plaintiff on or about May 11, 2001.  *Id.*  A

review of the memoranda indicates that the documents consist mainly of the recollections of Mr.

Saxe and Mr. Boyer in dealing with Plaintiff, and their rebuttal to Plaintiff's "number of serious and

unfounded allegations."  *See* Def.'s Mot. for Summ. J., Ex. BB (summaries from Boyer and Saxe);

*see also* Pl.'s Disputed Mat. Facts ¶ 48 (arguing, without any citation to the record, that Boyer and

Saxe "exaggerated and misrepresented issues, lied to the workforce, retaliated against the workforce

for seeking my guidance, and were so arrogant that they put it in writing to the workforce of the

BEP").

     The third document identified by Plaintiff was Mr. Erbe's June 19, 2001 email, which stated

to Gregory Davis, a union official, that "a recent publication issued by the EEO Office entitled

'Collective Bargaining and EEO' does not represent the views of the Department of Treasury or the

Bureau.  In fact, our office as well as LMR believe that the publication contains numerous

statements that are totally inaccurate and misrepresent the law with respect to that subject."  Def.'s

Stmt. of Mat. Facts ¶ 49; Pl.'s Disputed Mat. Facts ¶ 49 (contending that the information in the

pamphlet was not erroneous, and arguing that "[t]his in writing was a deliberate act to defame my

person and create a chilling affect [sic] throughout the workforce not to seek counseling from my

[sic] as the in-house EEO technical expert"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 49 (noting

(1) Plaintiff's non-responsive, unsubstantiated, and conclusory allegations are incompetent to raise a

genuine issue of material fact; (2) there is no competent evidence that Mr. Davis actually sent the

email to anyone else in the workforce, negating any possible "chilling effect"; (3) the email referred

only to "a recent publication by the EEO Office," and did not refer to Plaintiff by name, therefore

ensuring that no "defamation" occurred; and (4) the publication did in fact contain material misstatements of the law).

      6.     <u>BEP's Efforts to Support Plaintiff and Respond to His Concerns</u>

      i.     *Concerns Regarding Plaintiff Are Resolved*

HR Director Hutchinson contacted Ms. Pitts in May 2001 to discuss her concerns about Plaintiff.  Def.'s Stmt. of Mat. Facts ¶ 50; Pl.'s Disputed Mat. Facts ¶ 50 (not disputing underlying fact, but simply arguing that Ms. Hutchinson's expression of "her department's dislike of my participation in protected activity" was "a violation" and that she "defamed my ability by trying to insinuate that the information was incorrect and in fact it was precisely correct"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 50 (pointing out that Plaintiff's conclusory allegations fail to comply with LCvR 7(h) and are incompetent to raise a genuine issue of material fact).  Ms. Pitts immediately set up a meeting with Ms. Hutchinson, and the two spent close to two hours discussing Ms. Hutchinson's concerns.  Def.'s Stmt. of Mat. Facts ¶ 50.  Ms. Hutchinson emphasized that she was primarily concerned about the union incident – specifically, the accuracy of the information that Plaintiff had provided to the union – because the negotiations had to be stopped.  *Id*.  At no time did Ms. Hutchinson mention anything about Plaintiff's national origin.  *Id*.  That same day, Ms. Pitts relayed Ms. Hutchinson's concerns to Plaintiff.  *Id*.

In addition to expressing her concerns to Ms. Pitts, Ms. Hutchinson also informed Director Thomas Ferguson that members of the LMR staff felt that Plaintiff was "inappropriately involving himself in union business and dispensing incorrect information about EEO laws and how they applied in the collective bargaining process." *Id*. ¶ 51 (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) at ¶ 2).  At about the same time, Director Ferguson also received concerns from the Office of Chief Counsel that Plaintiff was "acting as an advocate for discrimination complainants,

rather than as a neutral Informal Counselor, and was giving out incorrect information concerning

EEO requirements." *Id.* (citing Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl) ¶ 3); Pl.'s

Disputed Mat. Facts ¶ 51 (contending that Plaintiff was simply doing the job for which he was hired,

and "was acting under the protection of 29 C.F.R. § 1614, Title VII, Title I of the ADA, and . . .

[the] anti-discrimination policies issued by the Director of the Agency"); Def.'s Reply to Pl.'s

Disputed Mat. Facts ¶ 51 (noting that Plaintiff does not dispute the facts asserted, which are based

on Director Ferguson's testimony, but instead "offers unrelated factual assertions and legal

conclusions" in a manner that fails to comply with LCvR 7(h)).

Having received concerns from two separate offices, Director Ferguson called a meeting

with Ms. Pitts, which occurred on June 12, 2001.  Def.'s Stmt. of Mat. Facts ¶ 52.  With respect to

the document Plaintiff had provided Brian Thompson entitled "Collective Bargaining and Equal

Employment Opportunity Laws," Ms. Pitts took Director Ferguson through both Plaintiff's

document and the Federal Labor Relations Authority ("FLRA") document upon which it was based.

*Id.*  Ms. Pitts ultimately convinced Director Ferguson that Plaintiff's document was largely true to

the FLRA document.  *Id.*; Pl.'s Disputed Mat. Facts ¶ 52 (arguing that this means that "[t]he

information presented by plaintiff was correct" and that "LMR and the Legal Department's actions

were motivated by [Plaintiff's] protected activity"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 52

(pointing out that Director Ferguson testified only that the publication was "largely" true to the

FLRA document, noting that the publication contained uncontested misstatements of the law, and

arguing that Plaintiff's conclusory allegation fails to comply with LCvR 7(h)).  Accordingly,

Director Ferguson told Ms. Pitts:  "Tell Julio if I'm not worried about it, then he shouldn't worry

about it."  Def.'s Stmt. of Mat. Facts ¶ 52 (quoting Def.'s Mot. for Summ. J., Ex. EE (Ferguson

Decl.) ¶ 5).  Ms. Pitts considered this a "strong statement coming from the head of the agency," *id*.

(quoting Def.'s Mot. for Summ. J., Ex. FF (Pitts Dep.) at 98:21-99:16), and told Plaintiff that she had defended him at the meeting and he had nothing to worry about, *id.* Based upon Ms. Pitts's report to him, Plaintiff understood that he had nothing to worry about from a management perspective. *Id.* (citing Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 82:9-84:11).

In response to Mr. Erbe's email of June 19, 2001, Ms. Pitts sent an email to Gregory Davis, the union representative, on June 27, 2001, which stated her position as to the EEO office's authority to issue publications on EEO matters without the prior approval of the Legal Department, and defended the accuracy of the "Collective Bargaining and EEO" document. Def.'s Stmt. of Mat. Facts ¶ 53. Plaintiff considered Ms. Pitts email to be sticking up for both him and the EEO office. *Id.* (citing Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 76:3-5). Ms. Pitts also met with Mr. Erbe to personally resolve these issues, and informed Plaintiff that she had done so. *Id.*; Pl.'s Disputed Mat. Facts ¶ 53 (contending that "[a]fter said meeting between Pitts and Erbe, the hostility continued and never stopped until plaintiff's departure"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 53 (noting that Plaintiff does not dispute the facts asserted, and instead makes an unrelated and conclusory allegation that fails to comply with LCvR 7(h) and is incompetent to raise a genuine issue of material fact).

ii.  *Institutional Remedies Created to Stifle Potential Problems*

Director Ferguson felt that the disagreements among the three offices – i.e., LMR, Legal, and EEO – should be addressed through a cooperative dialogue among the offices. Def.'s Stmt. of Mat. Facts ¶ 54. Accordingly, Ferguson met individually with the chief of each office and informed them that he expected them to resolve the issues among themselves. *Id.* He also instructed them that they were to meet on a weekly basis "to discuss any issues that might arise concerning interactions among the offices or concerning the offices' interactions with the workforce." *Id.* (citing Def.'s Mot.

for Summ. J., Ex. EE (Ferguson Decl.) ¶¶ 8-9); Pl.'s Disputed Mat. Facts ¶ 54 (contending that

"email exist were [sic] Ms. Pitts clearly indicated to Mr. Furgerson [sic] that Ms. Hutchinson was

declining to meet"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 54 (pointing out that Plaintiff

provided no record support for this allegation, and has failed to produce the purported email;

moreover, Ms. Pitts specifically testified that the weekly meetings did take place) (citing Def.'s Mot.

for Summ. J., Ex. CC (Pitts Aff.) at 4 of 6).   The weekly meetings of the three offices began

immediately and continued for at least the next three to four months.  Def.'s Stmt. of Mat. Facts ¶

55.   Director Ferguson kept abreast of these meetings through regular reports received from Ms.

Pitts, Mr. Kinsey (the head of the Legal Department), and Joel Taub (Ms. Hutchinson's supervisor).

*Id.*  Based on these reports, Director Ferguson felt that the weekly meetings "had succeeded in

resolving the disagreements among the offices and fostering a climate of cooperation."  *Id.* (citing

Def.'s Mot. for Summ. J., Ex. EE (Ferguson Decl.) ¶¶ 10-11).   Ms. Pitts generally agreed with this

assessment, finding that the meetings resulted in "some open discussions around ways to improve the

relationship between our offices."  *Id.* (citing Def.'s Mot. for Summ. J., Ex. CC (Pitts Aff.) at 4 of

6).

　　　　Further, in response to a concern that Plaintiff had raised through Ms. Pitts that some bureau

managers were not cooperating fully in EEO investigations, Director Ferguson issued a bureau-wide

memorandum on August 22, 2001, which re-stated his expectation that all employees would fully

cooperate with the EEO office.  *Id.* ¶ 56; Pl.'s Disputed Mat. Facts ¶ 56 (arguing that this shows that

"as far as August 2001, Legal and LMR were still enticing management not to cooperate with the

EEO office or myself in my capacity of Technical Adviser"); Def.'s Reply to Pl.'s Disputed Mat.

Facts ¶ 56 (noting that Plaintiff's allegation is non-responsive, devoid of citation to the record or the

support of competent evidence, and the fact is that the memorandum was issued *solely* in response to

Plaintiff's "representation," not in response to any proven flaws) (citing Def.'s Mot. for Summ. J.,

Ex. EE (Ferguson Decl.) at ¶ 12).   Plaintiff himself felt that this memorandum constituted strong

support both for the EEO office and for himself in particular.   *Id*. ¶ 57 (citing Def.'s Mot. for Summ.

J., Ex. H (Pl.'s Fourth Dep. Vol.) at 84:12-85:3); *see also* Def.'s Mot. for Summ. J., Ex. GG

(Director Ferguson's Mem.).   It is uncontested that Plaintiff did not have any run-ins with Messrs.

Saxe, Boyer, Carpenter, or Erbe – whether face-to-face, by email, or over the telephone – after

Director Ferguson's bureau-wide memorandum was issued on August 22, 2001.   *Id.*

### iii.    *Plaintiff Leaves the BEP*

Ms. Pitts learned in April or May 2001 that Plaintiff was applying for a position with

another agency.   *Id.* ¶ 58.   Upon gaining awareness of Plaintiff's application, Ms. Pitts wrote a letter

of recommendation for Plaintiff.   *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. HH (Pitts's Letter of

Recommendation for Plaintiff); Pl.'s Disputed Mat. Facts ¶ 58 (contending that he was thinking of

leaving the BEP because "he was told that it would take a divine intervention to get him

promoted"); Def.'s Reply to Pl.'s Disputed Mat. Facts ¶ 58 (pointing out that Plaintiff's "non-

responsive allegation" is "unsupported by competent record evidence" and that his statement fails to

comply with LCvR 7(h)).   Ultimately, several months later., Plaintiff was selected for a position at

the Department of Defense before receiving his first year-end performance evaluation at BEP.

Def.'s Stmt. of Mat. Facts ¶ 59.   However, Plaintiff told Ms. Pitts that he still wished to receive a

performance evaluation because he had left his previous job before receiving such an evaluation and

did not want his record to reflect a two-year period without an evaluation.   *Id.*   Ms. Pitts prepared a

year-end evaluation for Plaintiff, *see* Def.'s Mot. for Summ. J., Ex. E (Pitts Decl.) ¶ 9, in which she

rated Plaintiff as "Exceeded Standards," the highest rating possible.   Def.'s Stmt. of Mat. Facts ¶ 59;

Pl.'s Disputed Mat. Facts ¶ 59 (arguing that despite the alleged "hostilities," Plaintiff "clearly" "was

doing an outstanding job in all his duties as the in-house expert"); Def.'s Reply to Pl.'s Disputed

Mat. Facts ¶ 59 (pointing out that Plaintiff's argument lends further support to Defendant's

argument that he did not suffer from an actionable hostile work environment).

         iv.     *Plaintiff Brings This Action*

Prior to leaving the BEP, Plaintiff filed an informal EEO complaint on July 20, 2001,

Def.'s Mot. for Summ. J., Ex. JJ (Pl.'s Informal EEO Compl.), and a formal EEO complaint on

August 31, 2001, *id.*, Ex. P (Pl.'s Formal EEO Compl.).  Plaintiff's EEO complaint alleges that he

> was subjected to a hostile work environment because of discrimination based on his
> national origin (Hispanic) and in retaliation for involvement in the EEO process
> (opposition to potential discriminatory practices while serving as an EEO Specialist).
> In support of his claim, the Complainant states that commencing May 2001 to June
> 19, 2001: 1) he was subjected to degrading remarks about his ability to perform his
> duties; 2) he has been denied opportunities to perform his duties; 3) he has been
> denied access to EEO related meetings; 4) he has been falsely accused of impropriety
> and the misrepresentation of law; and 5) he has been subjected to continual,
> intentional, and a malicious defamation of his character regarding his professional
> abilities.

*Id.*  On May 3, 2002, Plaintiff filed a seven count Complaint alleging similar violations.  *See*

*generally* Compl.  As noted previously, following this Court's September 29, 2003 Memorandum

Opinion and Order, only Count I of Plaintiff's Complaint remains for consideration.  *See Matta v.*

*O'Neill*, Civ. No. 02-862 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and

denying-in-part Defendants' Motion to Dismiss and for Summary Judgment).  Count I alleges that

Plaintiff was subject to a hostile work environment based upon his national origin (Hispanic)[5] and in

retaliation for his activities as an EEO Counselor.  *See* Compl. at 13-15 (Count I).  As a remedy for

these alleged violations, Plaintiff seeks a declaratory judgment, an injunction, compensatory

---

    [5] Plaintiff does not claim that he was harassed on the basis of his race.  *See* Def.'s Mot. for
Summ. J., Ex. D (Pl.'s Third Dep. Vol.) at 34:10-35:1.

damages, and attorney's fees. *Id.* at 22-23.

## II: LEGAL STANDARDS

A.      *Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If

the evidence is merely colorable, or is not sufficiently probative, summary judgment may be

granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere

allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper

motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The

adverse party must do more than simply "show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of

identifying those portions of the record that demonstrate the absence of a genuine issue of material

fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is

a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in

original).

   Importantly, "[w]hile summary judgment must be approached with specific caution in

discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v.

Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v.

Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted),

*aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v.

James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of

summary judgment in discrimination cases") (citing cases). "Summary judgment is not a

'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and

inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*,

477 U.S. at 327). Accordingly, the Court reviews the defendant's motion for summary judgment

under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116

F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), overturned on other grounds, 156

F.3d 1284 (D.C. Cir. 1998) (en banc).  Nonetheless, while this special standard is more exacting, it

is not inherently preclusive.  Although more circumspect, the Court will continue to grant a motion

for summary judgment in which the nonmoving party has failed to submit evidence that creates a

genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

> B.      *Title VII's Burden-Shifting Framework*

Plaintiff brings this action pursuant to Title VII, which states that all personnel actions

affecting employees "shall be made free from any discrimination based on race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-16(a).  It is uncontested that Plaintiff was an employee

during the relevant time period and the Agency is an employer within the meaning of Title VII.  The

Court exercises jurisdiction over Plaintiff's Title VII claim according to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the

evidence that the actions taken by the Agency were "more likely than not based on the consideration

of impermissible factors" such as race or gender.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted).

Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ

the *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512,

516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d  668 (1973)).  It is the district court's responsibility to closely adhere to this analysis and go

no further, as it does not sit as a "super-personnel department that reexamines an entity's business

decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal

citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If he succeeds, the burden shifts to the Agency to articulate some legitimate, non-discriminatory reason for Plaintiff's non-selection or termination, and to produce credible evidence supporting its claim. *Id.* The Agency's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that the Agency's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly

by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. 1089). The Court of Appeals has distilled this analysis, noting that the jury can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289. However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier

of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary

judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23,

27-28 (D.C. Cir. 1997). "[T]he court must consider all the evidence in its full context in deciding

whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has

suffered discrimination." *Aka*, 156 F.3d at 1290.

### III: DISCUSSION

Upon a review of the record, it is plain that Defendant's Motion for Summary Judgment

must be granted for several reasons.  First, Plaintiff has failed to show that the challenged conduct

occurred "because of" his national origin or his opposition to discriminatory practices.  Rather, all

evidence indicates that the conduct, statements, and writings at issue reflected simple professional

disagreements between Plaintiff and his colleagues.[6]  Accordingly, Plaintiff cannot establish an

inference that the challenged conduct was discriminatory or retaliatory in nature.  Second, even if

Plaintiff could meet this requirement, Plaintiff has failed to make a showing of any of the relevant

factors used to support a finding that he suffered an actionable hostile work environment.  As such,

Plaintiff cannot establish that the work environment at the BEP's EEO office was sufficiently hostile

to be actionable under Title VII.  Third, and finally, Plaintiff has failed to show that the BEP knew

or should have known about the harassment but failed to take prompt and appropriate corrective

action.  Instead, the BEP clearly took a variety of appropriate steps to immediately address

Plaintiff's concerns such that it cannot be held vicariously liable for the conduct Plaintiff challenges

herein.

---

[6] Indeed, the record is essentially devoid of conflict between Plaintiff and his superiors and/or
supervisors.

A.      *None of the Relevant Incidents Are Clearly Related to Plaintiff's National Origin or His EEO Activity*

To establish a viable claim of harassment in violation of Title VII, Plaintiff must be able to show a nexus between his protected category or his EEO activity and the alleged harassing behavior. *See, e.g.*, *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 57 (D.D.C. 2004) (plaintiff must make the necessary causal connection between her race, color, or national origin and the alleged mistreatment; "[t]he mere fact that [plaintiff] was the sole non-Caucasian on the committee does not, without something more, suffice to make the necessary causal connection between [plaintiff's] race, color, and national origin and the alleged mistreatment" ); *Lester v. Natsios*, 290 F .Supp. 2d 11, 22 (D.D.C. 2003) ("it must be clear that the hostile work environment was the result of discrimination based on a protected status"); *Jones v. Billington*, 12 F. Supp. 2d 1, 12 (D.D.C. 1997) ("In the instant case, the Plaintiff has not demonstrated that any of the conduct about which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior.").  As the Second Circuit has emphasized,

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002); *see also Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999) ("to sustain a hostile work environment claim . . . [plaintiff] must produce evidence that she was discriminated against because of her [status]").

A review of the record indicates that Plaintiff relies upon seven incidents to prove harassment.  *See* Pl.'s Opp'n at 12-14.  Specifically, these seven incidents include:  (1) one meeting

in February/March 2001 in which Plaintiff and Mr. Carpenter disagreed about the law and Plaintiff

felt that Mr. Carpenter's tone got "a little aggressive," *see* Def.'s Stmt. of Mat. Facts ¶ 36; (2) a

meeting on March 13, 2001 in which Mr. Erbe spoke to Plaintiff in an angry tone of voice and was

dismissive of his input, *id*. ¶ 39; (3) one meeting in May/June 2001 in which Mr. Erbe stated, at the

beginning of the meeting, "What is he doing here?  We don't need EEO here," *id*. ¶ 40; (4) one

instance in mid-May 2001 in which Mr. Saxe – outside of Plaintiff's presence – told Officer

Vandergriff that Plaintiff "did not know what he was talking about" regarding medical

documentation to support a reasonable accommodation request, *id*. ¶ 42; (5) one meeting on May

10, 2001, without Plaintiff present, during which Mr. Saxe and Mr. Carpenter told union

representatives in a collective bargaining negotiation that "Mr. Matta has no business in any contract

talks and Mr. Matta is doing things outside his jurisdiction," *id*. ¶ 43; (6) one instance on May 25,

2001, outside of Plaintiff's presence when Mr. Erbe suggested to Lawrence Smith that Plaintiff need

not attend a subsequent meeting because "Julio Matta and him have different views of the law," *id*. ¶

44; and (7) one instance in August 2001 in which LMR Managers stated to Eric Cole:  "Where did

you [hear] that from[,] Julio Matta[?]," *id*. ¶ 45.[7]  Plaintiff also relies upon three written statements

---

[7] Plaintiff attempts to rely on two more incidents.  First, he seeks to rely on testimony from James Malloy that Malloy heard unnamed union officials tell Plaintiff that LMR representatives told them that Plaintiff's information was incorrect.  *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss, Ex. 4. Second, Plaintiff seeks to rely on testimony from James Jackson that his managers told him that LMR advised them not to follow Plaintiff's advice.  *Id*., Ex. 7.  To the extent the information relied upon by Plaintiff is based on second or third-hand statements, rather than personal knowledge, the Court notes that such testimony consists of inadmissible hearsay.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the . . . proceeding, offered in evidence to prove the truth of the matter asserted."); Fed. R. Evid. 802 ("Hearsay is not admissible.").  Because "[o]nly that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion," any hearsay statements relied upon by Plaintiff are legally insufficient to support his harassment/ hostile work environment claim.  10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2722, at 371-72 (3d ed. 1998); *see also Gleklen v. Democratic Cong. Campaign*

in his quest to establish harassment:  (1) and (2) the May 2001 memoranda by Mr. Saxe and Mr. Boyer that described what the authors considered to be instances of Plaintiff acting in disregard of his duties as a neutral Informal EEO Counselor, *id.* ¶¶ 48-49; and (3) Mr. Erbe's June 19, 2001 email in which he complained of inaccuracies in a "recent publication of the EEO Office" without even mentioning Plaintiff's name, *id.* ¶ 49.

Upon an examination of these ten collected "incidents" and writings, and the entire record herein, it is clear that Plaintiff cannot establish the required causation.  Rather, none of the identified incidents are "clearly related" to Plaintiff's national origin or his EEO activity.

1.  Plaintiff's National Origin

None of these comments or statements contain any reference whatsoever to Plaintiff's national origin.  Indeed, Plaintiff has testified specifically that he never heard Messrs. Saxe, Boyer, Carpenter, or Erbe make a single derogatory comment based on his race or national origin.  *See* Def.'s Stmt. of Mat. Facts ¶¶ 30, 35, 38, 41 (citing to Plaintiff's deposition).  Moreover, Plaintiff has presented no competent evidence that anyone else heard these individuals make a derogatory comment about Plaintiff based on his national origin.  *Id.* ¶¶ 42-45.  Indeed, a plain review of the incidents and statements at issue reveals that simple workplace and professional disagreements were at the heart of these incidents, and Messrs. Saxe, Boyer, Carpenter, and Erbe largely believed that (1) Plaintiff was misstating the applicable law and/or (2) Plaintiff was overstepping the bounds of his office, acting in the role of a partial advocate, and involving himself in matters outside of his jurisdiction.

---

*Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (hearsay evidence is insufficient to defeat summary judgment, as "[v]erdicts cannot rest on inadmissible evidence."); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998) ("An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to defeat summary judgment.").

Plaintiff does attempt to preserve his national origin harassment claim by citing to some "evidence" in the record in order to establish causation.  However, Plaintiff's effort fails in light of the fact that the testimony to which he cites is incompetent for the purposes of a summary judgment motion, in that it relies upon inadmissible hearsay or constitutes a series of conclusory allegations without factual support.  Specifically, Plaintiff cites to these four separate pieces of insufficient evidence.

First, Plaintiff contends that Mr. Eric Cole provides testimony indicating that Plaintiff was harassed by Mr. Boyer because of his race, when Mr. Boyer was allegedly "trying to accuse Plaintiff of initiating a dispute on pay and soliciting the approval of Mr. Cole."  Pl.'s Disputed Mat. Facts ¶¶ 32, 35.  However, a review of Mr. Cole's Affidavit highlights its insufficiency:  Mr. Cole simply answers the question, "Was the Complainant's race a factor in LMR treatment towards the Complainant?," by indicating that "*I think* that Complainant knew his job very well.  He was also a very proud person.  Because of his work ethics [sic] [,] *I think* that the staff in LMR was afraid of Complainant and yes I think race was a factor."  Pl.'s Opp'n, Ex. JJ (Cole Aff.) ¶ 6 (emphasis added).  Leaving aside that Plaintiff's Complaint identifies "national origin" rather than "race" as the source of his harassment, Mr. Cole's Affidavit is worthless in the summary judgment context, as it relies solely on his purported belief based on his own speculation, while citing no evidence to substantiate that belief.  *See* Fed. R. Civ. P. 56(e) (requiring that affidavits shall set forth such facts "as would be admissible in evidence" at trial); *see also supra* n. 7.

The second "evidence" Plaintiff cites to substantiate his claim that certain incidents that occurred outside the presence of Plaintiff were racially motivated is the deposition testimony of Brian Thompson.  *See* Pl.'s Disputed Mat. Facts ¶ 41.  In the portion of his testimony cited by Plaintiff, Mr. Thompson merely opines:

> Like I said, because of the distinct correlation of me being a minority and understanding how you have to hurdle over certain things in place, yes.
>
> There are just certain things that I *personally believe* if he was of another color, it would not have been an issue.  Or if he would have played ball, it would not have been an issue.
>
> *That's my opinion*.

Pl.'s Opp'n, Ex. F (Thompson Dep.) at 40:17-41:3 (emphasis added).  Once again, even leaving aside the "national origin" v. "race" distinction for the purposes of materiality, Mr. Thompson simply offers his "opinion" using his own experience as a guide rather than citing to any specific incidents involving Plaintiff.  His testimony is simply his own belief, with no citations to any events within his own personal knowledge.  As such, it is inadmissible hearsay and not considered for the purposes of summary judgment.  *See Gleklen*, 199 F.3d at 1369 ("Gleklen's evidence about the conversation is sheer hearsay; she would not be permitted to testify about the conversation at trial . . . . It therefore counts for nothing.").

Third, Plaintiff cites to the testimony of James Malloy in support of his contention that the "harassment" that he experienced was connected to his race.  *See* Pl.'s Disputed Mat. Facts ¶ 41 (citing to Pl.'s Opp'n Ex. H (Malloy Dep.) at 47:15-48:18 (race is a factor)).  Earlier in this litigation, Plaintiff introduced an Affidavit from Mr. Malloy, which stated that he believed "race and national origin was a major factor in the treatment" of Plaintiff by the individual Defendants.  Pl.'s Opp'n to Def.'s Mot. to Dismiss, Ex. 4 (Malloy Aff.) at 3.  The only basis Malloy provided for this conclusion is that one other minority EEO specialist "also had problems with the LMR office."  *Id*. Mr. Malloy was also deposed during the discovery process, wherein he expounded on his theories by stating:

> Well, based on my experience in the EEO office and based on the past experiences that the EEO office had with LMR, basically it was white males against black males

37

or Hispanic males or Hispanic African Americans in that case.

And yes, I think it's race.  You look at the color of his skin and you just like – the rest of the two, the other two males in my opinion whose jobs were being interfered with by in that particular office.  And that's the only way I could see it.

It had to be with race because they don't want anyone – you know, when you find African American men who are strong, who are very, very self-reliant, smart, you know, confident, and know their craft, it's hard to deal with them.  It's hard to deal with them because then you have to match your wits with theirs.  And that was threatening.

A smart – in my opinion what I have – and I hate to turn – but a smart black African American male is a danger in the workplace, especially if he's trying to do his job. It's a danger because then it's hard to by [sic] him off.  It's hard to curb him from doing right.  That's what's been my experience.

Def.'s Reply to Pl.'s Opp'n, Ex. 4 (Malloy Dep.) at 47:15-48:18.  Upon a review of these statements, it is clear that Mr. Malloy lacks any personal knowledge of any connection between Plaintiff's race or national origin and his treatment at the BEP.  Rather, he bases his testimony solely upon an inference that another minority "had problems" with the LMR office and his belief that intelligent African-American men are commonly viewed as general threat to their Caucasian superiors.  Mr. Malloy's testimony is therefore inadmissible hearsay and speculation, and is insufficient to create a genuine issue of material fact.  *Commercial Drapery Contractors*, 133 F.3d at 6 (affidavit consisting entirely of inadmissible hearsay is not sufficient to defeat summary judgment).

Fourth, and finally, Plaintiff relies upon his own deposition testimony, in which he testified that Ms. Pitts told him that "defendants from Labor Management have always harassed her minority men employees.  She referred to Defendant's as 'a bunch of racist s.o.b.'s.'" Pl.'s Opp'n at 13 (citing Pl.'s Opp'n, Ex. B (Matta Second Dep. Vol.) at 73:18-75:16); *see also* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 75:21-76:6 (testifying that Mr. Malloy witnessed Ms.

Pitts's comment).   Three major problems exist to undermine this "evidence."   First, the complete

purported comment, as related by Plaintiff in his deposition, was:   "what she basically told me . . . is

that she was very annoyed of [sic] how LMR was always bumping heads with her people in EEO.

She also referred to them at that time as racist SOBs . . . .   She didn't specifically say who but, you

know, Those people are a bunch of racist SOBs and they are always . . . treating my African

American men in this fashion."   Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 73:5-

73:17.   In light of the complete statement, it is evident that Ms. Pitts's purported comment is

inadmissible hearsay, based solely upon her personal speculation without any citation to the record

or any specific event.   Indeed, her alleged comment does not even identify who in the LMR was the

subject behind the discriminatory conduct.   The comment is therefore incompetent to imply any

discriminatory motivations to Messrs. Saxe, Boyer, or Carpenter.[8]   Second, in her deposition, Ms.

Pitts categorically denied having made this statement, ensuring that Plaintiff's testimony is

incompetent hearsay.   *See* Def.'s Reply to Pl.'s Opp'n, Ex. 9 (Pitts Dep.) at 91:16-92:8.   Third, Mr.

Malloy also contradicts Plaintiff's testimony, in that he testified only that Ms. Pitts said "the white

SOB's over in labor relations need to minds [sic] their business and stay out of mine."   Def.'s Reply

to Pl.'s Opp'n, Ex. 4 (Malloy Dep.) at 44:21-46:5.

Accordingly, Plaintiff's Title VII national origin harassment claim must fail because he fails

to establish any causal connection between the incidents cited to and his race or national origin.

Rather, (1) none of these comments or statements contain any reference whatsoever to Plaintiff's

race or national origin; (2) Plaintiff himself testified specifically that he never heard Messrs. Saxe,

Boyer, Carpenter, or Erbe make a single derogatory comment based on his race or national origin;

---

[8] Given that Mr. Erbe worked for the Legal Department, not LMR, he could not have been
the subject of the comment.

39

and (3) Plaintiff has presented no competent evidence that anyone else heard these individuals make

a derogatory comment about Plaintiff based on his race or national origin.  As such, Plaintiff cannot

make out a *prima facie* case of discriminatory national origin harassment and cannot even raise an

inference that the challenged conduct was discriminatory in nature.  Defendant's Motion for

Summary Judgment must be granted on this point.

### 2.        Plaintiff's EEO Activity

Title 42 U.S.C. § 2000e-3(a) provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because he has opposed any practice made an unlawful
> employment practice by this subchapter, or because he has made a charge, testified,
> assisted, or participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

*Id*.  Under this provision, a plaintiff may bring a "participation claim," i.e., plaintiff participated in

EEO activity and then experienced harassment or retaliation, or an "opposition claim," i.e., plaintiff

opposed an unlawful employment practice that others experienced and then suffered certain

actionable consequences.  Plaintiff here brings both types of claim, and each assertion is without

foundation and devoid of evidentiary support.

### i.        *Plaintiff's Participation Claim*

Defendant, in its Motion for Summary Judgment, points out that Plaintiff filed his informal

EEO complaint on July 20, 2001.  Def.'s Mot. for Summ. J. at 9 (citing Def.'s Mot. for Summ. J.,

Ex. JJ (Pl.'s Informal EEO Compl.)).  However, Defendant notes that according to Plaintiff, Messrs.

Saxe, Boyer, Carpenter, and Erbe began their harassing behavior in May 2001.  *Id*. (citing Def.'s

Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 20:5-21:13; *id.*, Ex. JJ (Pl.'s Informal EEO

Compl.)).  As such, Defendant contends that the incidents on which Plaintiff relies cannot have been

related to the filing of his EEO complaint because virtually all of the incidents pre-dated the

complaint.  Def.'s Mot. for Summ. J. at 9.

In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff fails to address this argument, and fails to revive his participation claim.  *See generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J.  It is well-settled in this Circuit that when a plaintiff files an opposition addressing only certain arguments raised by the defendant, "a court may treat those arguments that the plaintiff failed to address as conceded."  *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997); *see also United States v. Real Property Identified as: Parcel No. 03179-005R*, 287 F. Supp. 2d 45, 61 (D.D.C. 2003); *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002). Accordingly, the Court shall grant Defendant's Motion for Summary Judgment as it applies to Plaintiff's "participation claim," as Plaintiff has failed to cite to any material fact supporting his allegation and has failed to respond to the arguments made in Defendant's Motion for Summary Judgment.

ii.    *Plaintiff's Opposition Claim*

To the extent that Plaintiff seeks to show that Messrs. Saxe, Boyer, Carpenter, and Erbe behaved towards him as they did because of the manner in which he performed his EEO Counselor duties, i.e., his "opposition claim," Plaintiff's claim fails for two central reasons.

1.    No *Prima Facie* Showing of Oppositional Activity

Importantly, Plaintiff has not actually established that he was engaged in "oppositional activity" for the purposes of Title VII.  While Plaintiff frequently makes the conclusory assertion that he was opposing discriminatory practices, he has failed to identify any *specific* oppositional activity in which he was engaged.  A reading of Plaintiff's Opposition makes plain that Plaintiff simply assumes that by performing his duties as an EEO Counselor/Technical Adviser, he was

41

engaged in "opposition" within the meaning of 42 U.S.C. § 2000e-3(a). *See, e.g.*, Pl.'s Opp'n to

Def.'s Mot. for Summ. J. at 2 (without citation to the record, Plaintiff describes his role as "to

review, evaluate and *control managerial and supervisory performance* in such a manner as to

ensure continuing affirmative application and vigorous enforcement of the policy of equal

opportunity") (emphasis added); *id.* at 27 (ascribing the conduct of his alleged harassers to an

"animus toward Plaintiff's *position* as Technical Adviser to the Chief of EEO") (emphasis added).

Plaintiff's unsubstantiated, conclusory assumption is belied by his specific position

description. As a Senior EEO Specialist, Plaintiff was required to "[c]ounsel employees and

applicants who feel they have been discriminated against in the more complex and difficult cases."

Def.'s Stmt. of Mat. Facts ¶ 3 (citing Def.'s Mot. for Summ. J., Ex. C (Position Description, Senior

EEO Specialist) at 1; *id.*, Ex. D (Pl.'s Third Dep. Vol.) at 5:1-9). Plaintiff's official contacts were

with "supervisors and managers from first-line supervisors to Office Chiefs with representations

from the Bureau, unions, EEO Specialists, personnel management specialists, etc." *Id.* (citing Def.'s

Mot. for Summ. J., Ex. C (Position Description, Senior EEO Specialist) at 3). The purpose of these

contacts was to "resolve difficult and emotionally charged employment problems to obtain

agreement and/or necessary action on the part of Bureau managers concerning employment policies

and practices affecting Equal Employment Opportunity." *Id.* (citing Def.'s Mot. for Summ. J., Ex.

C (Position Description, Senior EEO Specialist) at 3-4; Def.'s Mot. for Summ. J., Ex. A (Pl.'s

Second Dep. Vol.) at 5:13-6:8).

Once Plaintiff took his additional position as a Technical Adviser, Plaintiff continued to

work as a full-time informal counselor, but also served as an "in house expert . . . on EEO matters."

*Id.* ¶ 7 (citing Def.'s Mot. for Summ. J., Ex. E (Decl. of Jean Pitts (hereinafter, "Pitts Decl.")) ¶ 4;

*id.*, Ex. B (Pl.'s First Dep. Vol.) at 39:22-40:21). The Technical Adviser position required that

Plaintiff help create orientation and training materials concerning EEO rights and responsibilities, and provide regular training to both the workforce and management on EEO rights and responsibilities. *Id.* Given these wide-ranging duties, Plaintiff was required to maintain "positive" work relationships with both "staff members" – including managers – and "customers" – i.e., those who sought EEO counseling. *Id.* ¶ 8 (citing Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 6:9-9:19; *id.*, Ex. F (Performance Standards and Elements for EEO Specialist/Technical Adviser) at 3). Moreover, Plaintiff, in his position as Technical Adviser, was required to display sensitivity to managers and customers, and maintain neutrality both in investigating informal complaints and in advising managers on EEO questions. *Id.* Adherence to these carefully-outlined duties and responsibilities was crucial, because the EEO office was responsible for the informal counseling stage of the discrimination complaint process, which included processing informal complaints, while formal complaints were to be investigated by the Regional Complaint Center. *Id.* ¶ 9. Importantly, the EEO office did not have the authority to file a complaint on behalf of an employee with the Regional Complaint Center. *Id.* As such, Plaintiff's role in processing an informal complaint was to impartially "find the facts" and then recommend appropriate action to the EEO Chief. *Id.* ¶ 10. Plaintiff's role as the Technical Adviser was not to make final determinations as to whether discrimination had or had not occurred. *Id.*

It is evident from the Position Descriptions of an EEO Counselor and a Technical Adviser that Plaintiff's duties required that he be an impartial fact-finder: neither Plaintiff nor his office had the authority to file a complaint on behalf of an employee, and his role did not involve making final determinations as to whether discrimination had or had not occurred. Plaintiff's position clearly contemplated that he be a neutral arbiter and dependable source for EEO information for supervisors, managers, Office Chiefs, representations from the Bureau, unions, EEO Specialists,

43

personnel management specialists, and covered employees.  Def.'s Mot. for Summ. J., Ex. C

(Position Description, Senior EEO Specialist) at 3.  Based on the relevant Position Descriptions, the

Court concludes that Plaintiff – having failed to identify any specific oppositional activity in which

he was engaged – cannot rely upon his position as an EEO Counselor alone to provide the *prima*

*facie* basis for his opposition claim.  *See Pendleton v. Rumsfeld*, 628 F.2d 102, 108-09 (D.C. Cir.

1980) (contemplating that the activities of an EEO Counselor do not necessarily constitute

"protected activity" or oppositional activity).  Moreover, in none of the incidents that Plaintiff relies

upon, *see* Def.'s Stmt. of Mat. Facts ¶¶ 36, 39-40, 42-45, 48-49, has he identified either a

discriminatory practice in which the BEP allegedly was engaged or oppositional conduct on his part

– as opposed to merely providing consultation on EEO requirements.  As such, the Court finds that

Plaintiff cannot establish that he was engaged in oppositional activity within the meaning of 42

U.S.C. § 2000e-3(a), let alone subject to illegitimate harassment and a hostile work environment

based on that activity.

> 2.     Criticisms of Plaintiff Were Valid; Plaintiff Cannot
>        Establish Pretext

Even assuming *arguendo* that Plaintiff was somehow actively "opposing" unlawful

discrimination during his tenure at the BEP, he clearly fails to present sufficient evidence to rebut

Defendant's wealth of evidence establishing that any criticisms directed at him were the result of his

colleagues's legitimate concerns about his neutrality and the accuracy of the information that he

provided.  While Plaintiff claims that his alleged harassers – Messrs. Saxe, Boyer, Carpenter, and

Erbe – "interfered with [his] opportunities to perform his duties as Technical Adviser to the Chief, in

opposition to discrimination," Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 12, Plaintiff's claim is

terminally undermined by his failure to rebut Defendant's showing that the conduct of the alleged

44

harassers was based on valid fears regarding Plaintiff's job performance.  Two points are significant and noteworthy.

First, Plaintiff, in his Opposition, failed to contest much of Defendant's evidence of his disruptive and non-neutral behavior.  *See* Def.'s Stmt. of Mat. Facts ¶¶ 15-27.  The instances of such behavior include Plaintiff's writing two memoranda to the JAAC in which he stated that a proposed removal of an employee from the program "would" be viewed as retaliation by the EEOC and as discrimination by the BEP's EEO office, even though (1) Plaintiff was not authorized to speak for the EEOC and (2) Plaintiff had not investigated whether there were similarly-situated white employees.  *Id.* ¶¶ 17-18.  Such instances also include Plaintiff's providing the JAAC apprentice in question a blind copy of the second of the two highly questionable memoranda.  *Id.* ¶ 18.  Plaintiff acknowledges having engaged in all of these behaviors.

Second, Plaintiff has failed to rebut Defendant's evidence that he repeatedly provided inaccurate information concerning EEO laws and requirements.  Indeed, Plaintiff's attempts to show that his advice was correct often lead him to contradict his binding testimony and backpedal from his assertions of accuracy.  *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 19 ("Even if the interpretation was erroneous . . . ."), at 21 ("Even if his interpretation was in error . . . .").  Defendant has conclusively identified five inaccuracies in the information provided by Plaintiff vis-á-vis EEO laws and requirements:

1.  In a November 29, 2000 email on which he cc'd Don Jamerson, Plaintiff opined that it would be a "direct violation of [29 C.F.R. §] 1614" for Mr. Jamerson to have Mr. Boyer investigate an alleged racial incident to determine whether *disciplinary* action was warranted.  *See* Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 15:21:15; *id.*, Ex. I (Pl.'s Email); *id.*, Ex. I (Mr. Jamerson's Email) ("I asked Mr. Boyer to investigate the accusations and if it was determined that they were substantiated, I would initiate the proper *disciplinary* action.") (emphasis added).  Plaintiff contends that his advice was correct, because "[b]y allowing LMR to conduct such investigation of an EEO allegation, is [sic] a conflict and violation of

19 CFR 1614 [sic] and MD-110."  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 17. However, a plain reading of 29 C.F.R. § 1614 and EEOC Management Director ("MD") 110 reveals that these provisions state only that an agency's EEO and personnel functions should be kept separate.  The provisions do not prohibit management from investigating allegations of workplace misconduct to determine whether disciplinary action is warranted.

2.    On May 3, 2001, Plaintiff called Mr. Saxe and advised him – in Officer Vandergriff's presence – that Commander Ashton was "in violation of the ADA and/or Section 501 of the Rehabilitation Act" for keeping reasonable accommodation-related medical documentation "in a private file cabinet in her office."  *See* Def.'s Mot. for Summ. J., Ex. P (Pl.'s Formal EEO Compl.) at Bates #000013-14; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 82:18-83:2.  However, Plaintiff acknowledged in his deposition that there is nothing illegal about this practice; rather, the only prohibition is in co-mingling medical records with personnel files, and the provisions of the ADA cited by Plaintiff in his Opposition confirms this.  *See* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 51:2-5; Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 18-19 (citing 42 U.S.C. § 12112(d)(3)(B)).

3.    Before May 3, 2001, Plaintiff had advised Commander Ashton "on several occassion[s]," of the "potential Per Se violation of illegally withholding medical documentation outside of Human Resources of the Medical department."  Def.'s Mot. for Summ. J., Ex. P (Pl.'s Formal EEO Compl.) at Bates #000014; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 61:15-63:21.  However, in Plaintiff's Opposition, he cites no authority whatsoever that requires reasonable accommodation-related medical documentation to be maintained solely in an agency's human resources office or its medical department.  *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 19-20.

4.    Plaintiff also called Saxe because he was concerned about Commander Ashton deciding for herself whether medical documentation was sufficient to support an accommodation request.  *See* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 51:14-53:24.  However, nothing in the Rehabilitation Act prohibits a supervisor from making such judgments.  Moreover, the EEOC's policy guidance specifically encourages such an action.  *See* Def.'s Mot. for Summ. J., Ex. KK (Excerpt from 2001 EEOC publication, "Establishing Procedures to Facilitate the Provision of Reasonable Accommodation") ("To eliminate unnecessary levels of review, agencies should authorize first-line supervisors to approve requests for reasonable accommodation whenever possible.").  In attempting to circumvent this fact, Plaintiff cites to Executive Order 13164 to substantiate his claim that a supervisor *must* consult a medical expert in evaluating the sufficiency of medical documentation.  However, a review of Executive Order 13164 reveals that it is the agency's *option* to have medical information reviewed by a medical expert of the agency's choosing – not that the agency is *required* to do so.  *See* Exec. Order 13,164 § 1(b)(6), 2000 WL 1114943 (Pres. Exec. Order July 26, 2000), 65 F.R.

46

46565.

5.     It is uncontested that Plaintiff's pamphlet entitled "Collective Bargaining and Equal Employment Opportunity Laws," which he gave to union representative Brian Thompson for use at a collective bargaining negotiation, *see* Def.'s Mot. for Summ. J., Ex. W (Thompson Dep.) at 53:18-56:22; *id.*, Ex. X (Pl.'s pamphlet), contains two direct misstatements of law.  *See* Def.'s Mot. for Summ. J., Ex. KK (Erbe Aff.); *see generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J. (failing to dispute this point). Specifically, Part IV of Plaintiff's pamphlet contains two statements that were overruled in *Luke Air Force Base v. Fed. Labor Relations Auth.*, 208 F.3d 221 (9th Cir. 1999) (table desc.), *cert. denied*, 531 U.S. 819, 121 S.Ct. 60, 148 L.Ed.2d 26 (2000).  *Compare* Def.'s Mot. for Summ. J., Ex. KK (copy of Plaintiff's pamphlet) at Bates #00298 (claiming (1) "[a] union has a right to be represented at a formal discussion within the meaning of section 7114(a)(2)(A) of the statute, even if the matter discussed concerns an EEO complaint being processed as part of an EEO proceeding"; and (2) "[a]n informal EEO complaint, unlike a formal EEO complaint, does not constitute a grievance for section 7114(a)(2)(A) formal discussion purposes . . . . You must remember that representation is a choice by the individual member who is filing his/her EEO complaint").  Moreover, this pamphlet caused rightful consternation because Plaintiff frequently inserted misleading phrases such as "in my professional opinion," *see* Def.'s Mot. for Summ. J., Ex. X (Pl.'s pamphlet) at 5, and because Plaintiff lifted large portions of the pamphlet verbatim from the FLRA General Counsel Guidance without citation – an act that Erbe considered to be plagiarism and an incorrect adoption of the FLRA's views to the BEP.  *See* Def.'s Mot. for Summ. J., Ex. KK (Erbe Aff.) at Bates #000277.

Ultimately, given the uncontested evidence of Plaintiff's disruptive and non-neutral behavior and the clear evidence showing Plaintiff's penchant for misstating the law, it is clear that the negative comments upon which Plaintiff relies to show harassment – e.g., (1) Mr. Boyer's memorandum to Mr. Carpenter outlining his concerns about Plaintiff's conduct on several occasions, *see* Def.'s Stmt. of Mat. Facts ¶¶ 47-48; (2) Mr. Saxe telling Officer Vandergriff that Plaintiff did not know what he was talking about with respect to what medical documentation Commander Ashton could request, *id.* ¶ 42; (3) Mr. Erbe telling Officer Smith that "Julio Matta and him have different views of the law," *id.* ¶ 44; and (4) Mr. Erbe's email stating that Plaintiff's "Collective Bargaining and Equal Employment Opportunity Laws" pamphlet contained misstatements of the law, *id.* ¶ 49 – were clearly legitimate statements of concern about Plaintiff by

47

his colleagues.  *See Pendleton*, 628 F.2d at 108 (rejecting retaliation claim of two EEO Counselors for participating in on-the-job demonstration because such conduct suggested that they had "fatally compromised their ability to gain the confidence of middle management, as spelled out in the Handbook, and that they were lacking in ability to appreciate management's point of view or see the facts as management saw them . . . . The decision to remove any employee must be made primarily in light of that employee's duties.  A question of retaliation is not raised by a removal for conduct inconsistent with those duties, unless its use as a mere pretext is clear."); *see also B.T. Jones v. Flagship Int'l*, 793 F.2d 714, 729 (5th Cir. 1986) (upholding dismissal, even if plaintiff acted with "sincere opposition to unlawful employment practices under Title VII," because plaintiff's activities "rendered [her] ineffective in the position for which she was employed," wherein she "played a crucial role in equal employment matters involving the company"); *Smith v. Singer Co.*, 650 F.2d 214, 217 (9th Cir. 1982) (rejecting opposition claim by plaintiff because "by filing complaints against Singer because he disagreed with their choice of policies, appellant placed himself in a position squarely adversary [sic] to his company.  In so doing he wholly disabled himself from continuing to represent the company's interests . . . .").

Here, Plaintiff cannot show that any of the incidents he relies on reasonably can be construed as having occurred "because of" his national origin or alleged opposition to illegal practices.  All competent evidence – including numerous admissions by Plaintiff demonstrating that he acted non-neutrally and gave incorrect advice on occasion – points to the conduct of Messrs. Saxe, Boyer, Carpenter, and Erbe as being motivated solely by their legitimate concerns about the manner in which Plaintiff was conducting his duties.  Lacking this important characteristic, Plaintiff's allegations and competent evidence cannot support a claim of hostile work environment.  Summary judgment in Defendant's favor is therefore warranted.

48

B.    *Plaintiff Has Failed to Show that He Was Subjected to a Severely Hostile or Abusive Work Environment*

Even assuming *arguendo* that Plaintiff could raise an inference that he was criticized or circumvented "because of" his national origin, race, or opposition to discriminatory practices, Plaintiff's claims must fail because he cannot establish that he was subjected to a work environment sufficiently hostile to be actionable under Title VII.  *See* Compl. at 13-15 (Count I) (Plaintiff alleges that he was subjected to a hostile work environment based on his national origin and in retaliation for his activities as an EEO Specialist).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Terms, conditions, or privileges" encompass tangible as well as psychological harm.  *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  In addition, the Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct.367, 126 L.Ed.2d 295 (1993) (quotation omitted).  As such, the plaintiff must demonstrate:  (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action.  *See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 120

(D.D.C. 2004) (citing cases).  In determining whether a hostile work environment exists, the

Supreme Court has directed the courts to look at the totality of the circumstances, including "'the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct.

2275, 141 L.Ed.2d 662 (1998) (quoting *Harris*, 510 U.S. at 23).  While the plaintiff is not required

to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be

able to support such a claim.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C.

Cir. 2000).

  In addition, the Supreme Court has circumscribed the definition of a hostile work

environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that

Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275

(citations omitted).  Indeed, these standards are intended to "filter out complaints attacking 'the

ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related

jokes, and occasional teasing.'" *Id.* (citations omitted).  "Even a few isolated incidents of offensive

conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.

Cir. 2002) (citing *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996)

("holding that the fact that alleged incidents were spread over a seven-year period suggested that the

harassment was not sufficiently pervasive to establish [] Title VII liability"); *Baskerville v. Culligan

Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("holding that nine incidents spread over seven months

did not constitute sexual harassment because the supervisor never touched employee and incidents

were not sufficiently severe or pervasive")).

In this case, Plaintiff has alleged ten (10) instances of co-workers making negative comments about his job performance, most of which occurred from May through July 2001. *See* Def.'s Stmt. of Mat. Facts ¶¶ 36, 39-40, 42-45, 47; *see also* Def.'s Mot. for Summ. J., Ex. JJ (Pl.'s Informal EEO Compl.). Upon a review of these incidents, it is clear that these comments – whether oral or written – amount to nothing more than simple professional disagreements, which Title VII obviously does not forbid. *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 48-49 (D.D.C. 2001) ("Many of the alleged incidents, while unpleasant, amounted to little more than everyday workplace disputes."). No slurs of any kind were directed at Plaintiff. *See* Def.'s Mot. for Summ. J., Ex. A (Pl.'s Second Dep. Vol.) at 140:1-14. Plaintiff was not physically or verbally threatened. *Id.* The only incidents that occurred in Plaintiff's presence involved what he himself described as Mr. Carpenter or Mr. Erbe being "rude" or "dismissive." *See* Def.'s Stmt. of Mat. Facts ¶¶ 36, 39, 40. The rest of the other "negative" comments about which Plaintiff complains were made outside of his presence; as a matter of law, such comments cannot be considered particularly severe – especially where, as here, the comments were not explicitly discriminatory. *See* Def.'s Mot. for Summ. J., Ex. H (Pl.'s Fourth Dep. Vol.) at 100:23-102:14; *compare Lester*, 290 F. Supp. 2d at 31 (noting importance of the fact that incidents of vandalism did not happen to the plaintiff, but occurred in the workplace around her); *Jones*, 12 F. Supp. 2d at 12 (holding that plaintiff's report to a nurse that he heard that racial remarks were being made against him, but not in his presence, was not sufficiently severe as to create a hostile working environment); *Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000) (holding no hostile environment where co-worker told plaintiff that other employees had used racial epithets, because "through the grapevine" or "second-hand" conduct is not sufficiently severe or pervasive); *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464,

467 (7th Cir. 1998) (while employee comment was offensive, it did not rise to the level of

discrimination because it was made outside of the plaintiff's presence).  Finally, the alleged negative

comments occurred over a short period of time; according to Plaintiff, the harassment occurred "over

a period of roughly four months."  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 4.  Given all of these

factors, it is evident that even if the incidents cited to by Plaintiff were somehow motivated by his

national origin or oppositional activity, the incidents are insufficiently severe to create a hostile work

environment.

Plaintiff attempts to escape this logical conclusion by making unsubstantiated, conclusory

allegations that the alleged harassers created a hostile work environment by so thoroughly defaming

him throughout the workforce and so continually blocking his access to EEO-related meetings that

he was prevented from functioning as a Technical Adviser.  Plaintiff's argument is without

foundation for numerous reasons.  First, Plaintiff himself has acknowledged that despite the alleged

harassment, he continued to do "an outstanding job in all his duties as the in-house expert."  Pl.'s

Opp'n at 29; Def.'s Mot. for Summ. J., Ex. E (Pitts Decl.) ¶ 9 (rating that Plaintiff "Exceeds

Standards," the highest rating possible, in his year-end evaluation).  As such, Plaintiff concedes that

any "harassment" did not interfere with his performance and did not affect a term, condition, or

privilege of his employment.  *See Faragher*, 524 U.S. at 787-88, 118 S.Ct. 2275 (noting that a

major factor to consider for the purposes of a hostile work environment claim is whether the conduct

reasonably interferes with the employee's performance); *Holbrook v. Reno*, 196 F.3d 255, 263

(D.C. Cir. 1999) (affirming judgment as a matter of law because record indicated only that plaintiff

returned to the position and continued to perform exceptionally well).  Second, virtually all of

Plaintiff's allegations are not supported by competent evidence of record.  *See* Def.'s Reply to Pl.'s

Disputed Mat. Facts ¶¶ 14, 39.  Third, and more importantly, at most, Messrs. Saxe, Boyer,

Carpenter, and Erbe denied Plaintiff access to two meetings, meaning that their conduct was neither

frequent nor severe. *See* Def.'s Reply to Pl.'s Opp'n., Ex. 6 (Smith Dep.) at 69:7-69:14 (on May

25, 2001, Erbe suggested to Officer Smith, but did not insist, that Plaintiff not attend the June 5,

2001 meeting); *id.*, Ex. V (Thompson Aff.) at 2 (on May 10, 2001, Messrs. Saxe and Carpenter

rejected Mr. Thompson's suggestion that Plaintiff "come to the next meeting [of the collective

bargaining negotiations] to oversee the two articles in [the union's] contract that deal directly with

EEO policy and laws").

In a final effort to identify some negative impact that might be considered severe or extreme,

Plaintiff alleges that the purported conduct of Messrs. Saxe, Boyer, Carpenter, and Erbe created a

"chilling effect" that cost him a promotion to a GS-14 position and ultimately forced him to resign

from the agency. Pl.'s Opp'n at 26. Two problems doom this allegation. First, Plaintiff alleges that

it was Ms. Pitts who denied him the promotion. *Id.* at 28. Leaving aside the point that Plaintiff

worked in the BEP for roughly one year, making a promotion claim somewhat hasty, Plaintiff has

acknowledged that Ms. Pitts was not among the persons he claims harassed him. *See* Def.'s Mot. for

Summ. J., Ex. B (Pl.'s First Dep. Vol.) at 80:11-81:10. As such, Plaintiff fails to show how the

alleged harassment by Messrs. Saxe, Boyer, Carpenter, and Erbe – who were his colleagues and not

supervisors or superiors – resulted in the denial of a due promotion. Second, this Court has already

considered this final allegation and rejected it. In the Court's September 29, 2003 Memorandum

Opinion, the Court dismissed with prejudice Plaintiff's Title VII constructive discharge claim,

holding that "Plaintiff has failed to provide a sufficient evidentiary basis upon which a reasonable

jury could conclude that his employer tolerated or created the allegedly discriminatory working

conditions." *See Matta v. O'Neill*, Civ. No. 02-862, at 30-31 (D.D.C. Sept. 29, 2003)

(memorandum opinion granting-in-part and denying-in-part Defendants' Motion to Dismiss and for

Summary Judgment).  Moreover, the Court also dismissed Plaintiff's purported Title VII failure-to-promote claim.  *Id.* at 30.

Ultimately, considering *in toto* all incidents cited by Plaintiff, the Court concludes that Plaintiff cannot meet the standards necessary for proving an actionable national origin-based or retaliation-based hostile work environment.  Rather, these incidents were infrequent; occurred over a short period of time; were the product of Plaintiff's interactions with his colleagues, not superiors or supervisors; were not physically threatening; and were not extreme.  The incidents focused on by Plaintiff reveal that he was at the center of several professional disagreements and conduct which is certainly permissible under the strictures of Title VII.  Accordingly, even if Plaintiff could somehow raise an inference that he was harassed "because of" his national origin and/or his "opposition" to discriminatory practices, Plaintiff's Title VII hostile work environment claim would still fail.

C.     *Plaintiff Has Failed to Show that Defendant Knew or Should Have Known of the Alleged Harassment But Failed to Take Prompt and Appropriate Corrective Action*

Even if Plaintiff could prove an actionable work environment, Defendant would still be entitled to summary judgment, as Plaintiff cannot prove that Defendant knew or should have known of the alleged harassment but failed to take prompt and appropriate action.  Importantly, when Plaintiff reported his concerns to his supervisors, Ms. Pitts and Director Ferguson, they both took "prompt and appropriate corrective action."  *Curry v. Dist. of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).

Under Title VII, "[a]n employee may be held liable for the actions of its employees if the employer knew or should have known about the actions of the employees that caused the hostile environment and if the employer did not take appropriate and timely steps to correct the problem." *Hodges v. Washington Tennis Sports Serv. Intern., Inc.*, 870 F. Supp. 386, 388 (D.D.C. 1994)

54

(citing cases).  To assess whether an employer's response is adequate, courts should look to "the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment."  *Curry*, 195 F.3d at 662 n.17 (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)).  For instance, in *Curry*, the D.C. Circuit found that two clear, prompt verbal admonitions were an effective response to the initial report of a co-worker's blatantly sexual remarks and that the defendant did not need to take formal disciplinary action.  *Id.* at 660.  In contrast, where a plaintiff alleged having reported sexual harassment several times and the supervisor's *only* response was to suggest that plaintiff ignore or accept the harassment, the response was not considered adequate.  *See Lucero-Nelson v. Washington Metro. Area Transit Auth.*, 1 F. Supp. 2d 1, 6 (D.D.C. 1998).

A review of the record indicates that Plaintiff has failed to show that Defendant's substantial actions taken in response to his complaints were inadequate.  Upon Plaintiff's expression of his concerns to Ms. Pitts in May 2001, *see* Def.'s Mot. for Summ. J., Ex. E (Pitts Decl.) ¶ 5; *id.*, Ex. A (Pl.'s Second Dep. Vol.) at 21:14-16, Ms. Pitts and Director Ferguson immediately took five steps to attempt to address Plaintiff's concerns.  Specifically, (1) Ms. Pitts met with Ms. Hutchinson, the LMR officials' supervisor; (2) Ms. Pitts met with Mr. Erbe; (3) Director Ferguson met with the chiefs of all three offices in question and ordered them to resolve the issues; (4) Director Ferguson directed the heads of the three offices to meet on a weekly basis to establish a cooperative dialogue; and (5) Director Ferguson issued a bureau-wide memorandum that set forth his expectation that everyone would cooperate with the EEO office.  Def.'s Stmt. of Mat. Facts ¶¶ 50-56.

These actions were not only prompt and appropriate, but also effective in resolving the

situation.  While Plaintiff now tries to argue that, despite these efforts, "[t]he hostilities continued

against Plaintiff, as witnessed by the workforce," Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 31,

Plaintiff is left with his binding deposition testimony in which he acknowledged that he had no

further run-ins with Messrs. Saxe, Boyer, Carpenter, or Erbe – whether face-to-face, by email, or

over the telephone – after Director Ferguson issued his bureau-wide memorandum on August 22,

2001.  *See* Def.'s Mot. for Summ. J., Ex H (Pl.'s Fourth Dep. Vol.) at 99:18-23.  Clearly, the

agency responded reasonably to the concerns reported by Plaintiff, a consideration that led this Court

to dismiss Plaintiff's constructive discharge claim in its earlier opinion.  *See Matta v. O'Neill*, Civ.

No. 02-862, at 31 (D.D.C. Sept. 29, 2003) (memorandum opinion granting-in-part and denying-in-

part Defendants' Motion to Dismiss and for Summary Judgment) (holding that, "in light of the

undisputed evidence regarding the efforts Defendant took to address Plaintiff's complaints, . . . [no]

reasonable jury could conclude that his employer tolerated or created the allegedly discriminatory

working condition").  Accordingly, even if Plaintiff could make out an actionable hostile work

environment, Defendant cannot be held vicariously liable for it.  As such, once again, Defendant is

entitled to summary judgment.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary

Judgment in full.  An Order accompanies this Memorandum Opinion.

Date:   December 16, 2005

                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge